**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**DAVID HENRY ALLEN,**

      **Plaintiff,**

**vs.**                            **CIVIL ACTION NO. 3:20-CV-00291**

**ANDREW SAUL, COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

<u>**PROPOSED FINDINGS AND RECOMMENDATION**</u>

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. By Order entered April 27, 2020 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Memorandum in Support of Plaintiff's Motion for Judgment o[n] the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 18, 21)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for entry of an award for benefits or alternatively, remand (ECF No. 18); **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 21); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from this Court's docket for the reasons stated *infra*.

**Procedural History**

The Plaintiff, David Henry Allen, (hereinafter referred to as "Claimant"), protectively filed his application for benefits on February 28, 2017[1] (Tr. at 410-441) because of congestive heart failure, carpal tunnel syndrome, ADD, neuropathy, schizoaffective disorder, bipolar, anxiety, depression, a pinched nerve, and spinal fusion (Tr. at 470). His claim was initially denied on July 6, 2017 (Tr. at 332-342) and again upon reconsideration on September 14, 2017 (Tr. at 346-352). Thereafter, Claimant filed a written request for hearing on September 21, 2017 (Tr. at 353).

An administrative hearing was held on January 28, 2019 before the Honorable Melinda Wells, Administrative Law Judge ("ALJ"). (Tr. at 182-203) On February 21, 2019, the ALJ entered an unfavorable decision. (Tr. at 86-104) On April 3, 2019, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 409) The ALJ's decision became the final decision of the Commissioner on February 27, 2020 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-7)

On April 24, 2020, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 13, 14) Subsequently, Claimant filed a Memorandum in Support of Plaintiff's Motion for Judgment o[n] the Pleadings (ECF No. 18), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 21). Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

---

[1] Though Claimant alleged an onset date of February 27, 2013. (Tr. at 431) Pursuant to 20 C.F.R. § 416.335, the relevant period in this case begins in February 2017, the month of Claimant's application date. (Tr. at 89)

Claimant was 50 years old as of the application date and defined as "person closely approaching advanced age" throughout the underlying proceedings. See 20 C.F.R. § 416.963(d). (Tr. at 97) Claimant has a high school education and completed three years in college, but did not obtain a degree. (Tr. at 187, 471) Claimant last worked in August 2007 at Linens 'n Things stocking shelves for less than six months (Tr. at 899); he alleged he stopped working because of his conditions, a broken hand, and "they were going out of business" (Tr. at 471).[2] The ALJ determined Claimant did not have any past relevant work (Tr. at 97, 200).

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims, 20 C.F.R. § 416.920.  If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §

---

[2] The record contains three other SSA disability denials: on April 23, 2010, ALJ Richard E. Ouelette denied Claimant's November 2007 applications (Tr. at 207-218); on January 3, 2012, ALJ Phylis M. Pierce denied Claimant's July 2010 applications (Tr. at 228-238); on April 11, 2015, ALJ James P. Alderisio denied Claimant's April 3, 2013 application (Tr. at 248-261).

416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. § 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart P of part 404 of this chapter for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter.

(4) When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 416.920a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 416.920a(e)(4).

## Summary of ALJ's Decision

At the first step, the ALJ determined that Claimant had not engaged in substantial gainful activity since February 27, 2017, the application date. (Tr. at 91, Finding No. 1) At the second inquiry, the ALJ found that Claimant had the following severe impairments: degenerative disc disease of the lumbar spine; obesity; asthma; speech sound disorder; bipolar disorder; and somatic symptom disorder. (Id., Finding No. 2) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 92, Finding No. 3) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work except he can:

> occasionally balance and climb ramps and stairs, but never climb ladders, ropes or scaffolds. He can frequently stoop, kneel, crouch, and crawl. He should avoid more than occasional exposure to temperature extremes, wetness, vibration, fumes, odors, dust, gases, and poor ventilation, but can never work at unprotected heights. He can perform simple one-to-two step instructions and maintain occasional contact with the public and coworkers.

(Tr. at 94, Finding No. 4)

At step four, the ALJ found Claimant has no past relevant work. (Tr. at 97, Finding No. 5) In addition to the transferability of job skills being a non-issue, Claimant's age, education, work experience and RFC, the ALJ then determined that there were other jobs that existed in significant numbers in the national economy that Claimant can perform. (Id., Finding Nos. 6-9) Finally, the

ALJ determined Claimant had not been under a disability since the application date of February 27, 2017. (Tr. at 98, Finding No. 10)

**Claimant's Challenges to the Commissioner's Decision**

Claimant argues that that the ALJ erred in several respects: (1) that she failed to develop the record, specifically with respect to the vague findings of Angela Null, M.S., the psychological examiner; (2) that she erred in finding Claimant's back pain with having few abnormalities and in finding his mental impairments were stable, as this is ostensibly contrary to Ms. Null's findings; (3) that she failed to include Claimant's limitations stemming from his mental impairments in the hypothetical posed to the vocational expert, resulting in a flawed RFC assessment; (4) that she erred in finding Claimant's back pain was treated conservatively with having few objective abnormalities because he received injections, which is not conservative treatment; (5) that she failed to consider Claimant's pain and perform a proper credibility determination; (6) that the ALJ failed to consider the combination of Claimant's impairments which precluded Claimant from performing substantial gainful activity; and (7) that the ALJ "failed in his duty to produce evidence sufficient to rebut the presumption of disability." (ECF No. 18 at 13-19) Claimant requests this Court reverse the final decision for an award of benefits or to remand to correct these errors. (Id. at 19)

In response, the Commissioner asserts that Claimant carried the burden of proving disability, and that the record was sufficiently developed for the ALJ to render a decision; the ALJ considered Ms. Null's observations and compared them to the remaining objective medical evidence and other evidence of record which showed some observations were inconsistent. (ECF No. 21 at 11-12) Additionally, the Commissioner contends that Ms. Null, a one-time examiner,

provided findings that were not entitled to controlling weight; regardless, the ALJ noted the inconsistencies in the record, and fashioned an appropriate RFC, which is not required to be based upon a single medical opinion, but on the record as a whole. (Id. at 12-14) The Commissioner argues that the ALJ's finding Claimant's back impairment was treated conservatively and showed few objective abnormalities is supported by the evidence, and not in error. (Id. at 14-15) The ALJ also properly considered Claimant's subjective complaints and found them inconsistent with the record. (Id. at 15-16) The ALJ also considered the combined effect of Claimant's impairments. (Id. at 16-17) Finally, the Commissioner points out there is no presumption of disability and that substantial evidence supported the ALJ's decision and asks this Court to affirm. (Id. at 17-18)

**The Relevant Evidence of Record**[3]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

Evidence Related to Physical Functioning:

Claimant has a history of treatment for bilateral sciatica and back pain (Tr. at 630-804, 861-892). On November 3, 2016, following his move from Tennessee, Claimant established care in West Virginia with RhondaLeffingwell APRN, FNP-C (Tr. at 878, 879). He reported that he had been off psychiatry medications since June 2016, when he moved to Tennessee from Florida

---

[3] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings, with exception to those records referenced in Claimant's brief that were not before the ALJ for consideration, but submitted to the Appeals Council nearly seven months after the ALJ issued her decision. Pursuant to the Regulations, a claimant bears the responsibility to inform the ALJ or otherwise submit all evidence no later than five business days before the hearing. See 20 C.F.R. § 416.1435. Claimant's counsel did not advise of any additional outstanding records. (Tr. at 185-186) Further, Claimant makes no argument that any of the additional evidence submitted after the hearing (i.e., Tr. at 8-181) warrants consideration under 20 C.F.R. §§ 404.935, 404.970 or sentence six pursuant to 42 U.S.C. § 405(g). Accordingly, to that extent, any such argument pertaining to that issue has been waived. Hunt v. Nuth, 57 F.3d 1327, 1338 (4th Cir. 1995) (reviewing court will generally not address arguments not raised in opening brief).

(Tr. at 878). He reported that the Tennessee Health Department "were not helpful" in getting him back on his psychotropic medications (Tr. at 879). He reported a history of multiple chronic conditions: hypertension, hyperlipidemia, dental abscesses and caries, anxiety, bipolar, depression, schizophrenia, nicotine dependence, drugaddiction in remission (methamphetamine), hepatitis C (two years), insomnia, pruritus, and low back pain with sciatica down left leg (Tr. at 878). He admitted that his hypertension and insomnia were "well-controlled" on medication and his alleged back pain was "better controlled" using Lyrica, 50 mg twice a day (Tr. at 878-879).

On examinations in November 2016 and in February 2017, his lumbosacral spine demonstrated a full range of motion; he had normal cognitive functioning; unimpaired memory; and a normal stance and gait (Tr. at 872, 876, 880). Claimant's mood was anxious, but his thought processes were not impaired (Id.). Notably, in February 2017, Claimant complained of hip pain, (Tr. at 869), and on examination, he had positive trigger points at the gluteal muscles and medial knees bilaterally (Tr. at 872). Ms. Leffingwell diagnosed fibromyalgia and prescribed gabapentin (Tr. at 865).

On March 14, 2017, Claimant completed a personal pain and fatigue questionnaire, and he reported that his "back down to arms and side are on fire" (Tr. at 894). He reported that he had stabbing and throbbing, and numbing and stinging in his legs (Id.). He reported he experienced this alleged pain "all day 24 HRS" (Id.). He reported that he was unable to stand for long and could not move around without pain (Tr. at 895). He reported that his alleged pain restricted his cleaning and hanging with friends (Id.); affected his concentration; limited his ability to care for himself (i.e., he needed help buttoning shirts and sat while showering); and limited his ability to lift more than a gallon of milk, walk a block, and sit for more than an hour (Tr. at 896). He reported

that he spent his day taking medications, eating and laying around (Id.).

From June 30, 2017 through August 14, 2017, Claimant had 10 chiropractic adjustments at Overstreet Family Clinic (Tr. at 958-966, 991-1008). His initial complaints were acute pain in the lumbar spine with stiffness, numbness, weakness, radiation into his legs and interrupting his sleep. (Tr. at 958) He endorsed exacerbating factors such as bending, lifting, standing, sitting, activity, driving, and walking. (Id.) It was noted his range of motion was significantly decreased in flexion, extension, right lateral rotation, left lateral rotation, right lateral flexion, and left lateral flexion. (Tr. at 959) It was noted after his initial sessions, he responded well to the adjustment without issues (Tr. at 960, 965, 994, 998). He was advised of proper sleep habits, how to properly perform activities of daily living, and advised against bedrest (which was only recommended for "severe" leg pain) (Tr. at 960, 964, 993, 1001, 1006). It was noted that Claimant's symptoms decreased; he had less complaints of pain and increased range of motion (Tr. at 960, 993, 997, 1001, 1005).

Claimant's diagnostic imaging, a lumbar spine x-ray, taken on August 4, 2017, showed mild L5/S1 degenerative changes with facet arthropathy (Tr. at 969). A September 2017 lumbar spine MRI showed mild bilateral foraminal narrowing from L3/4 through L5/S1 and an annular tear at L5/S1 (Tr. at 1157, 1216, 1309).

On March 23, 2018, Claimant sought treatment from St. Mary's Medical Center (Tr. at 1029-1032) His chief complaint was constant low back pain, sciatica, and bilateral leg pain that he described as burning, numb and stabbing. (Tr. at 1029) He reported that his pain was aggravated by activity and relied by rest and Lyrica; he also endorsed bowel and bladder incontinence. (Id.) It was noted that Claimant had an antalgic gait and range of motion facet

loading pain with flexion which went down his legs. (Tr. at 1031) On May 4, 2018 Claimant underwent a nerve conduction study and electromyography due to his complaints of low back pain with radiating into his lower extremities with tingling and numbness; the results were normal with no evidence of lumbar radiculopathy or focal neuropathy. (Tr. at 1062)

In May 2018, Douglas Henson, M.D., examined Claimant for evaluation of possible lipoma check; the examination was normal, with no acute distress and normal gait and station noted (Tr. at 1011). Psychiatrically, Dr. Henson noted Claimant was oriented to person, place and time with a normal mood and affect (Id.).

In a follow-up appointment in June 2018 with Ms. Leffingwell, Claimant's current medications were refilled and he was recommended to follow up again in six months. (Tr. at 12-46-1249) In July 2018, an office note indicated that Claimant reported pain with flexion of the lumbar spine and sensitivity over the lumbar spine bilaterally with an antalgic gait (Tr. at 1026, 1031). His mood was not anxious or depressed (Tr. at 1026). In July and August 2018, Claimant received L4/5 left epidural steroid injections (Tr. at 1042-1045).

In October 2018, Claimant treated at the emergency room for complaints of low back pain and sciatica in both legs (Tr. at 1017). His examination showed an antalgic gait and pain with lumbar flexion (Tr. at 1019). He was assessed with lumbago, annular disc tear and chronic pain syndrome (Tr. at 1020).

Evidence Related to Mental Impairments:

Claimant has a history of bipolar disorder diagnosis (Tr. at 578-628). On February 14, 2017, Claimant met with Rhonda Leffingwell, APRN, FNP-C (Tr. at 869-873) His chief complaints were hip pain and having high blood sugars at home (Tr. at 869) It was noted that his

anxiety and depression were not well controlled and that he wanted to see psychiatry to be placed back on his antipsychotic and mood stabilizing medications (Tr. at 871); it was noted his cognitive functioning was normal and memory and thought processes were not impaired (Tr. at 872) He demonstrated full range of the lumbosacral spine and his gait and stance was normal. (Id.)

On February 17, 2017, during the initial psychotherapy examination with Sherri Steele, LPC, Claimant presented casually dressed with appropriate hygiene and grooming (Tr. at 866, 948). His posture and gait were unremarkable (Tr. at 866). His activity level was normal; he was oriented; and his eye contact was appropriate (Tr. at 866-67). Claimant's speech was relevant, his tone and volume normal, and he showed no evidence of significant problems with thought content (Tr. at 867). Claimant denied hallucinations and delusions (Id.). Claimant's mood, concentration, judgment, and insight were normal, and his affect was congruent (Id.). He denied suicidal ideation (Tr. at 866).

Counselor Steele diagnosed Claimant with schizoaffective disorder, bipolar type (Tr. at 867). Claimant was cooperative, engaged and participated well, and established rapport "easily" with the clinician (Tr. at 868). At the two follow-up visits in March 2017, Claimant's objective mental status examination was unchanged (Tr. at 861-862, 946, 948-949). He reported a marked improvement in anxiety and an increase in depression, as he was frustrated by his social security disability denials (Tr. at 862).

Claimant stated that his biggest stressor was his living environment: he was living with "a friend" he met online, and they had been living together for three weeks (Tr. at 867). Prior to that, he was living with a friend, who asked him to leave (Id.). He reported a history of homelessness three times in his life (Id.). Claimant reported a traumatic history of sexual abuse and drug

addiction (stating that he had been sober for 10 years) (Id.).

Claimant established care with Stacy Sheppard, PMHNP-BC, in April 2017 for medication management (Tr. at 940-944). During subsequent examinations in May and June 2017, she noted Claimant was oriented to time, place and person (Tr. at 918, 931, 943). He had an adequate fund of knowledge with no impairment of abstract reasoning and no impaired judgment (Id.). His speech was normal (Id.). Claimant had no decreased eye contact (Id.). His mood was euthymic; affect normal; thought processes not impaired; and insight intact (Id.). Ms. Sheppard prescribed Claimant Effexor and Abilify (Tr. at 944). A month later, on May 10, 2017, Claimant denied any problems with Abilify but complained of continued paranoia (having trust issues and paranoia in public) (Tr. at 928).

On May 22, 2017, Angela Null, M.S., conducted a consultative mental status examination on behalf of the agency (Tr. at 898-903). Claimant was accompanied by a friend (Tr. at 898). Claimant reported that he has never been married and he had no children (Id.). He cited medical and mental health issues as his primary reason for being unable to work (Tr. at 899). Claimant presented with psychotic symptoms (paranoia, auditory and visual hallucinations); depressive and manic episodes (feelings of sadness, crying spells, isolation, decreased motivation, loss of interest, fatigue and irritability); chronic pain complaints, and speech difficult to understand (stuttering) (Id.). Claimant stated that he had not used methamphetamines for 10 years (Id.).

Claimant was casually dressed with proper hygiene and grooming and was also oriented (Tr. at 900). Claimant had multiple bruises on his legs and wrists (Id.). He appeared his stated age of 50 years (Id.). Claimant was generally cooperative, and his eye contact varied (Id.). His speech was coherent, despite sound substitutions (Id.). His mood appeared dysphoric, and his affect was

frequently cheerful (Id.). His thought processes were connected, and there was no indication of paranoid ideation (Id.). There was no evidence of unusual perceptual experiences during the evaluation (Id.). Judgment and insight were intact based on Claimant's responses to comprehension and social awareness questions (Tr. at 900-901). Claimant's immediate memory appeared to be moderately deficient and his remote memory mildly deficient (based on his alleged difficulty in recalling details of his personal history), but his recent memory was grossly intact (Tr. at 901). Claimant's concentration was also grossly intact (Id.). His persistence was generally intact and his pace normal (Id.). Ms. Null opined that Claimant's social functioning during the evaluation was moderately deficient based on clinical observations of social interactions (eye contact, mannerisms, sense of humor, etc.) (Id.). Ms. Null diagnosed Claimant with schizoaffective disorder, bipolar type; somatic symptom disorder with persistent pain, moderate; and speech sound disorder (Id.). She opined that Claimant's prognosis was poor, but he appears capable of managing his finances should an award be made (Tr. at 902).

Treatment notes from Ms. Steele in May, June and July 2017 show no abnormality in Claimant's mental status (Tr. at 909-949). From May through September 2018, his mental status was again normal (Tr. at 1009-1014, 1066-1142, 1219-1260, 1265-1299).

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that he is unable to work because he has sciatica in his lower back and down his legs, making it difficult for him to stand for 15 to 20 minutes and sitting for 10 minutes; he also said that to get back and forth to work without transportation would be an issue. (Tr. at 188) He stated that his has pain in his back "all the time" and that it radiates into his legs "all the

14

time." (Id.) He stated that standing for more than 20 minutes and sitting for a long period of time makes his pain worse; he stated that his medications help, but do not take the pain away completely. (Tr. at 188-189) He can walk for about 20 minutes before he has to stop. (Tr. at 192)

Claimant also stated that he has bilateral carpal tunnel and that he has wrist pain "all the time"; he said that ice and sometimes heat makes the pain better. (Tr. at 189) He uses braces for both wrists that he wears "all the time", but needs new ones. (Tr. at 191) He testified that he can lift no more than five pounds (Tr. at 192). He has trouble reaching because he "can feel it in [his] lower back" and if he uses his right hand, he can "feel the pull in [his] lower back and in [his] hip" (Tr. at 192). Claimant testified that his hands cause him trouble with writing, cooking, pulling things out of the refrigerator – on good days he can use buttons and zippers, but on bad days, he needs a friend to dress him – he has bad days "more than half the month." (Tr. at 193)

Claimant testified that he takes several medications for his physical and psychological conditions. (Tr. at 189-190) He said that his blood pressure is controlled. (Tr. at 190) Though he takes medications for depression and anxiety, he still has "bouts" of depression and anxiety, and admitted his anxiety was up "due to the circumstances of this right now." (Id.) He stated he has side-effects from his medications, including sleepiness, blurred vision, cotton mouth, and dizziness. (Id.) He received spinal injections for his pain, but they did not help any. (Id.) He had physical therapy and chiropractic care as well, but that also did not help with his pain. (Tr. at 190-191) At the chiropractor's office, he was treated with a TENS unit, which he said felt good for the time it was on, but usually an hour afterwards, his pain returned. (Tr. at 191) Claimant testified that he used a cane, but usually when he knows he will be going out for a long part of the day, otherwise, he will not take it with him. (Id.) He said the cane was prescribed. (Id.)

Claimant testified that he goes to counseling once a month and that it helped. (Tr. at 192) Claimant also testified that he still has panic attacks two to three times a month despite using medication and counseling. (Tr. at 198) He said these attacks last fifteen minutes to a few hours. (Id.)

He has trouble with his memory, his concentration, and tends to get extremely irritated around too many people (Tr. at 193) He stated he has trouble sleeping at night and he takes two to three hour naps every day. (Id.) He needs help getting in and out of the bathtub, although he can bathe himself. (Tr. at 194) He does not do household chores, and can fix microwave dinners. (Id.) He shops, but if it takes longer than 20 minutes, his friend will finish the shopping while he waits in the vehicle. (Id.) He does not go out to eat, go to the movies, go to church, and has no hobbies; to pass the time, he watches TV. (Id.) He goes to doctor appointments on average five to six times a month. (Tr. at 199)

Vocational Expert ("VE") Testimony:

The impartial VE testified during the hearing with no objection from Claimant's attorney. (Tr. at 200) The ALJ asked the VE to assume a person of Claimant's age, education, and work experience who could perform light work, except he can occasionally balance and climb ramps and stairs; frequently stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; should avoid more than occasional exposure to temperature extremes, wetness, vibration, fumes, odors, dust, gases and poor ventilation; can never work at unprotected heights; can perform simple, one to two step instructions and maintain occasional contact with the public and coworkers. (Id.)

The VE identified a significant number of light jobs existing in the national economy, such as the representative examples of garment bagger, office cleaner, and inspector (Tr. at 201). When

asked if the individual had to alternate between sitting, standing, and walking at 20-minute intervals without leaving the workstation or work area, the VE responded that there would be no work in the national economy (Id.). Additionally, if the individual were to be off task 15% or more of the workday on a persistent basis, or be absent from work two or more days a month on a persistent basis, there would be no jobs to accommodate that individual. (Tr. at 202)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

As an initial matter, Claimant has taken the position the ALJ "failed in his duty to produce

evidence sufficient to rebut the presumption of disability." (ECF No. 18 at 18-19) However, no such presumption exists. <u>Salmons v. Astrue</u>, No. 3:09-cv-01268, 2011 WL 612866, at *16 (S.D.W. Va. Feb. 11, 2011) (Eifert, M.J.); see <u>Preston v. Heckler</u>, 769 F.2d 988, 990 n.* (4th Cir. 1985) ("The ultimate burden to prove disability lies on the claimant."). Claimant offers nothing in support of this argument. Accordingly, to the extent Claimant argues the ALJ had a duty to rebut the presumption of disability, this argument lacks merit.

<u>The Duty to Develop the Evidence:</u>

Claimant has also asserted, in a conclusory fashion, that this case should be remanded "to develop the record fully and fairly" with respect to Ms. Null's psychological evaluation report, specifically to inquire further as to why she gave Claimant a poor prognosis and to what extent his pain impacted his social, occupational, and daily functioning. (ECF No. 18 at 13-14).

In <u>Cook v. Heckler</u>, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence." <u>Cook v. Heckler</u>, 783 F.2d 1168, 1173 (4th Cir. 1986). The Court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." <u>Id</u>. The court explained that the ALJ's failure to ask further questions and to demand the production of further evidence about the claimant's arthritis claim in order to determine if it met the requirements in the listings of impairments amounted to a neglect of his duty to develop the evidence. <u>Id</u>.

Nevertheless, it is Claimant's responsibility to prove to the Commissioner that he is disabled. 20 C.F.R. § 416.912(a) ("In general, you have to prove to us that you are blind or disabled. You must inform us about or submit all evidence known to you that relates to whether

or not you are blind or disabled." Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that he has an impairment, further, the Regulations are clear that this responsibility is ongoing at each level of the administrative review process. Id. The Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step. The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . . If the process ends at step two, the burden of proof never shifts to the Secretary. . . . It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as Claimant's counsel. Clark v. Shalala, 28 F.3d 828, 830-831 (8th Cir. 1994). In this case, Claimant was represented by counsel and the ALJ has the right to assume that Claimant's counsel was presenting the strongest case for benefits. See Laney v. Astrue, 2011 WL 11889, at *11 (S.D.W.Va. Jan. 4, 2011) (Eifert, M.J.) (citing Nichols v. Astrue, 2009 WL 2512417, at *4 (7th Cir. 2009). An ALJ's duty to develop the record does not require him to make specific inquiries into Claimant's treatment modalities or search for cumulative evidence; his duty is to obtain sufficient evidence upon which he can render an informed decision. Id. (internal citations omitted).

Claimant bears the burden of establishing a *prima facie* entitlement to benefits. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") Similarly, Claimant

"bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

In this case, the ALJ expressly considered the medical evidence concerning Claimant's mental impairments from June 2012 through November 2018[4] which included not only treatment records from his providers for his mental impairments, but also treatment notes recording mental status findings from providers for his physical impairments, the reports of the State agency medical and psychological examiners, the opinion evidence provided by State agency consultants, as well as the findings of the prior ALJ. (Tr. at 91-97) In addition, the ALJ reviewed other evidence, which included Claimant's testimony and statements made in his application for benefits concerning his limitations from both his physical and mental conditions; significantly, the ALJ acknowledged Claimant's testimony concerning his persistent pain symptoms. (Tr. at 93-95)

Claimant does not specify what evidence the ALJ lacked in order to make an informed decision. Nevertheless, it is clear that the ALJ made numerous references throughout her decision concerning the evidence of record, which included Claimant's own statements concerning the frequency and limiting effects of his impairments. Indeed, Claimant underwent a psychological consultative examination in order to develop the record. (Tr. at 898-903) At the start of the administrative hearing, when the ALJ specifically asked Claimant's counsel if there was any additional evidence that needed to be submitted in support of Claimant's case, Claimant's counsel advised, "No, nothing's been brought to my attention." (Tr. at 185-186) In short, Claimant has failed to demonstrate any paucity in the evidence that would have necessitated the ALJ to further

---

[4] "Absent evidence to the contrary, it must be presumed that the ALJ reviewed all of the materials in the record and presented by the [Claimant]." Turner v. Berryhill, 2017 WL 2805498, at *4 (N.D.W.Va. June 28, 2017) (citing Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite to specific evidence does not indicate that it was not considered."). "[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." Reid v. Commissioner of Social Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam).

develop the record.

Accordingly, the undersigned **FINDS** that Claimant's contention that the ALJ erred by failing to develop the record is without merit.

<u>Evaluation of Symptoms in Disability Claims:</u>

Claimant has also argued in a conclusive fashion that the ALJ "disregarded" and "failed to properly consider" the record as it related to Claimant's pain, as well as failed to perform a "credibility determination" (ECF No. 18 at 16-17).

SSR 16-3p[5] clarifies the evaluation of symptoms, including pain: 20 C.F.R. § 416.929 requires a finding of the extent to which an individual's statements about pain or other symptom(s) and its functional effects can reasonably be accepted as consistent with the objective medical evidence and other evidence; that explains the factors to be considered in assessing the consistency of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the consistency of the individual's statements.

The Ruling further directs that adjudicators use a two-step process for evaluating an individual's symptoms: first, it must be determined that the individual has a medically determinable impairment ("MDI") that could reasonably be expected to produce the individual's alleged symptoms; and second, the intensity and persistence of the individual's symptoms must be evaluated to the extent which they limit the individual's ability to perform work-related activities. <u>See</u>, SSR 16-3p, 2016 WL 1119029, at *3-4. This evaluation must be based on a consideration of

---

[5] Effective March 28, 2016, SSR 16-3p superseded SSR 96-7p and therefore governed the ALJ's decision herein. <u>See</u>, SSR 16-3p, 2016 WL 1131509. The new Ruling eliminates the use of the term "credibility" from SSA policy because the Regulations do not use that term: "we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation." <u>See</u>, 2016 WL 1119029, at *1.

all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and

laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or

examining physicians or psychologists and other medical sources; and (3) statements and reports

from the individual and from treating or examining physicians or psychologists and other persons

about the individual's medical history, treatment and response, prior work record and efforts to

work, daily activities, and other information concerning the individual's symptoms and how the

symptoms affect the individual's ability to work.

A claimant's symptoms, including pain, are considered to diminish his capacity to work to

the extent that alleged functional limitations are reasonably consistent with objective medical and

other evidence. 20 C.F.R. § 416.929(c)(4). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your
> prior work record, your statements about your symptoms, evidence submitted by
> your treating, examining, or consulting physician or psychologist, and observations
> by our employees and other persons . . . Factors relevant to your symptoms, such
> as pain, which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or
> have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your
> pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms
> (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on
> a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to
> pain or other symptoms.

Id. § 416.929(c)(3).

Contrary to Claimant's argument, even a cursory review of the written decision shows that

the ALJ considered his complaints of pain, as well as his medication and other treatment modalities

for his pain. (Tr. at 94-95) For instance, the ALJ initially acknowledged that Claimant has degenerative disc disease of his lumbar spine, and that an MRI in September 2017 corroborated this impairment. (Tr. at 91, 1157, 1216, 1309) Moreover, the ALJ acknowledged that despite not having been diagnosed with carpal tunnel syndrome, Claimant has a history of such complaints and had experienced improvement with braces and Lyrica (Tr. at 92, 637); she also noted that he testified that he has pain in his wrists "all the time" that he uses ice packs and hearing to make them feel better, in addition to using wrist braces and Lyrica (Tr. at 95). Throughout the written decision, the ALJ recognized that the medical record, as well as Claimant's own testimony, supported his complaints of chronic lower back pain that radiates into both legs, and that he was prescribed a cane that he will use when he knew he would be out for a while. (Tr. at 94)

In addition to her review of the medical record[6], described in greater detail, *supra*, some of the ALJ's more significant notations from the relevant period concerning Claimant's back issues/bilateral sciatica included the following: during a February 2017 examination, no abnormality was noted (Tr. at 95, 958-966, 991-1008)[7]; (Tr. at 29, 633); a July 2017 examination was normal (Tr. at 95, 909-957); an August 2017 x-ray indicated mild degenerative changes (Tr. at 95, 967-990); nerve conduction studies and EMG of the lower extremities from May 2018 were normal, as well as an examination during that time (Tr. at 96, 1017-1065, 1011); a July 2018 examination indicated Claimant had pain with flexion of the lumbar spine and sensitivity bilaterally for which he received left epidural steroid injections (Tr. at 96, 1042, 1044); following

---

[6] As noted *supra*, the ALJ considered medical records that predated the application date, and even referenced office treatment records from March 2014 to May 2016 from the St. Petersburg Health Department, when Claimant lived in Florida. (Tr. at 95, 630-804)

[7] The ALJ referenced treatment records from Overstreet Family Chiropractic dated June 30, 2017 to July 31, 2017 in addition to Overstreet Family Clinic records dated August 4, 2017 to August 14, 2017.

an emergency department visit in October 2018 with complaints of low back pain and sciatica in both legs and exhibiting an antalgic gait and pain with lumbar flexion (Tr. at 96, 1017-1065), a subsequent examination in November 2018 was normal (Tr. at 96, 1066-1159).

The ALJ gave considerable attention to Claimant's testimony, *supra*, with numerous references to Claimant's allegations of chronic pain, including but not limited to the following: that he finds it difficult to stand longer than 15 to 20 minutes or sit for more than 10 minutes; that he can walk about 20 minutes and lift no more than five pounds at a time; that he has problems reaching due to lower back pain that radiates up his side and that he can feel it pulling in the lower back and hip; that he has pain in his lower back "all the time"; the pain radiates into his legs "all the time"; standing for more than 20 minutes or sitting for prolonged periods make his pain worse; that his medications help, but does not completely alleviate his pain; that he received spinal injections, physical therapy, and chiropractic treatment, but these did not help alleviate his pain; that he does not own a TENS unit, and although it helped his pain, after an hour the pain returned; that he uses a cane that was prescribed, but does not take it with him if he drives to the 7-11, but will take it when he knows he will be gone for a while. (Tr. at 94) With respect to Claimant's carpal tunnel syndrome, the ALJ acknowledged Claimant said he has pain in both wrists "pretty much all the time" and that his wrists swell, for which he uses ice packs and a heating pad to make them feel better. (Tr. at 95) She noted Claimant takes Lyrica and wrist braces for the pain, though he needed new braces, and he wears them most of the time. (Id.) She noted that he reported writing, cooking, and pulling things out of the refrigeration cause him pain, and that on good days, he can use zippers and buttons, but on bad days, his friend helps him get dressed, which occurs more than half of the month. (Id.) The ALJ also noted that Claimant testified that he can bathe himself, but

needed assistance to get in and out of the bathtub, "and once in, sitting down." (Id.) She noted that he does no household chores, but can prepare microwaveable meals. (Id.)

Next, the ALJ performed the requisite credibility/consistency analysis endorsed by Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1995). (Id.) The ALJ determined that "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (Id.) The ALJ then reviewed the medical evidence of record, *supra*, highlighting the aspects that undercut his allegations of totally disabling pain. (Tr. at 95-97) In Hines v. Barnhart, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing Craig v. Chater, 76 F.3d at 595).

Recently, the Fourth Circuit emphasized the adjudicator's role in evaluating subjective symptoms, holding that "an ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." See Arakas v. Comm'r, Soc. Sec. Admin., 983 F.3d 83, 98 (4th Cir. 2020) (internal citations omitted). The Fourth Circuit "reiterate[d] the long-standing law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms." Id. It is important to recognize that in Arakas, the Court concluded that substantial evidence did not support the ALJ's finding that the claimant's subjective complaints were inconsistent with her daily activities because the overall

record actually supported her subjective complaints and demonstrated she would be unable to engage in substantial gainful activity. Id. Another significant, if not critical, aspect of the Arakas holding is that the Court found the ALJ's analysis included misrepresentations or overinflation of the claimant's abilities, to the exclusion of that evidence which did not support such a conclusion. Id. For purposes herein, this Court must determine if the subject ALJ's analysis relied primarily on the lack of objective medical evidence as the reason for discounting Claimant's complaints.

The foregoing demonstrates that the ALJ in this case did not overinflate Claimant's capabilities while ignoring the evidence tending to support his allegations of functional limitations; the ALJ herein did not make factual misrepresentations or misinterpretations of the evidence of record in order to make a nondisability finding. Indeed, given the conflicting evidence consisting of Claimant's allegations of pain and other symptoms with the objective and other evidence of record, the ALJ is solely responsible for resolving the conflict; the issue before the Court is not whether Claimant is disabled, but whether the ALJ's finding is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Craig v. Chater, 76 F.3d at 589. In this case, it appears that the ALJ gave scrupulous attention to the evidence, including Claimant's allegations of pain, what helped his pain, and what did not relieve his pain, as well as a review of the conflicting medical and other evidence requiring some reconciliation.

Accordingly, the undersigned **FINDS** that Claimant's arguments that the ALJ disregarded the record concerning Claimant's pain and failed to evaluate his symptoms against the evidence of record lack merit, the undersigned further **FINDS** that the ALJ's assessment of Claimant's subjective complaints is supported by the substantial evidence.

The Combination of Impairments:

26

Claimant takes issue with the ALJ's descriptions for his impairments, namely, that his back pain was treated "conservatively with few objective findings of abnormalities" and that his mental impairments were "stable", and appears to suggest that the ALJ misinterpreted the evidence concerning his physical and mental conditions (ECF No. 18 at 14, 15). Claimant also contends that the ALJ failed to consider the combination of his impairments, but offers nothing in support of this contention (Id. at 17-18). Although Claimant asserts that the medical records indicated that he suffered from numerous impairments, he does not specify which impairment specifically meets or equals any Listing. As noted *supra*, Claimant bears the burden of proving he has an impairment or combination of impairments that meets or medically equals the severity of Listing requirements. See Bowen, 482 U.S. at 146, n.5.

The Regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

See 20 C.F.R. § 416.923(c). When confronted with a combination of impairments, an adjudicator must not only acknowledge "the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." Oppenheim v. Finch, 495 F.2d 396, 398 (4th Cir. 1974). The Fourth Circuit has held that the ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. Id. In short, the ALJ must analyze the cumulative or synergistic effect that the various

impairments have on Claimant's ability to work. DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

"The Listing of Impairments . . . describes for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." See 20 C.F.R. § 416.923(a); Sullivan v. Zebley, 493 U.S. 521, 532 (1990). To qualify for benefits, Claimant must show that his combination of impairments is "equivalent" to a listed impairment, and he "must present medical findings equal in severity to all the criteria for the one most similar listed impairment." See Id. at 531. A claimant must meet all, not just some, of the criteria for a listing to apply. Id. at 530.

Earlier in the written decision, at the second step in the sequential evaluation process, the ALJ acknowledged Claimant's obesity, noting that the record showed that his weight ranged from 179 pounds to 219 pounds, with a height ranging from 63 inches to 65 inches (Tr. at 91, 630-804, 861-892, 909-957, 967-990, 991-1008, 1009-1016, 1066-1159, 1160-1218, 1219-1312). She also noted the record demonstrated that he suffered from mood swings, periods of depression, and was "sometimes manic" (Tr. at 91, 578-629, 861-892, 898-903, 909-957, 1009-1016, 1066-1218). She acknowledged the record showed that he reported hearing voices in his head, and "had a myriad of complaints, including anxiety, abdominal pain with nausea and vomiting, general malaise and fatigue, lightheadedness/double vision, and a lack of stamina/strength", and that the psychological consultant diagnosed somatic symptom disorder with persistent pain moderate (Tr. at 91, 818, 901).[8]

In addition, as noted *supra*, the ALJ considered the evidence of record, including both the

---

[8] The ALJ specifically referred to a treatment record from Florida dated May 24, 2016 that recorded this list of complaints.

objective medical evidence as well as Claimant's testimony, concerning his alleged limitations related to carpal tunnel syndrome. (Tr. at 92) The ALJ also recognized that Claimant alleged congestive heart failure, but noted that an August 2015 chest x-ray only showed atherosclerotic changes of the ascending aorta (Tr. at 92, 735) and that a May 2016 medical record listed congestive heart failure, "but acute resolved"[9] (Tr. at 92, 833). The ALJ also noted that a second chest x-ray from May 2017 showed no acute cardiopulmonary process (Tr. at 92, 986). Thus, as with Claimant's carpal tunnel syndrome, the ALJ determined his congestive heart failure was a non-medically determinable impairment. (Tr. at 92)

Also as noted *supra*, at the third step in the sequential evaluation process, the ALJ explicitly found that none of Claimant's impairments, singly or in combination, met any of the Listings' requirements. (Tr. at 92) Absent any evidence to the contrary, a reviewing court must take the ALJ's findings at his word. See Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014). Indeed, this Court has previously determined that an ALJ properly considers impairments in combination where she discusses each impairment separately and finds that the claimant's impairments, when considered together, did not prevent him from performing basic work activities. See, e.g., Wiseman v. Colvin, 2015 WL 9075457, at *19 (S.D.W. Va. Nov. 24, 2015), *report and recommendation adopted by*, 2015 WL 9008899 (S.D.W. Va. Dec. 15, 2015).

With regard to his severe physical impairments, the ALJ evaluated Claimant's degenerative disc disease of the lumbar spine under Listing 1.04 and noted that the September 9, 2017 MRI of the lumbar spine showed no evidence of compromise of the nerve root or spinal cord (Tr. at 92, 1157, 1216, 1309). The ALJ also noted that Claimant's asthma, which was considered under

---

[9] This treatment note also indicates that Claimant's COPD, seizures, bipolar, depression, neuropathy, schizophrenia, and chronic back pain were also resolved.

Listing 3.03, did not meet Listing requirements because Claimant's pulmonary function studies showed a FEV1 of 2.45 and FVC of 2.99 were "well above" the requirements of 1.40 and 1.75, respectively (Tr. at 92, 1202).[10] Regarding Claimant's speech sound disorder under Listing 2.00[11], the ALJ noted that "[d]espite this diagnosis by the psychological consultative examiner, there has been no specific testing to determine the exact cause of the claimant's speech sound disorder, and the undersigned was able to under[stand] [Claimant] well at the hearing", accordingly, she determined this disorder did not meet Listing requirements (Tr. at 92).

With regard to Claimant's mental impairments, after having considered them singly and in combination, the ALJ found that the medical evidence along with the other evidence of record, which included Claimant's own statements, did not meet or medically equal Listing requirements under 12.04 and 12.07. (Tr. at 93) In understanding, remembering, or applying information, the ALJ found Claimant had moderate limitations: though Claimant alleged he has difficulty completing tasks and paying bills, he also stated that he could perform simple maintenance, prepare microwaveable meals, go to his doctor's appointments and take his medications (Tr. at 93, 461-468)[12]; the ALJ also noted that during his examination with Ms. Null, he showed moderately deficient immediate memory and mildly deficient remote memory (Tr. at 93, 898-903). In interacting with others, Claimant had only moderate limitations, as the ALJ noted he alleged difficulty engaging in social activities, but he also alleged getting along with others, spend time with friends and family, shops, and lives with others; the ALJ further noted that during his

---

[10] The ALJ referenced a pulmonary function diagnostic test taken on December 3, 2018 at the Cabell Huntington Hospital.
[11] Pursuant to Listing 2.09:
      Loss of speech due to any cause, with inability to produce by any means speech that can be heard, understood, or sustained.
[12] The ALJ referenced Claimant's statements in his Work History Report submitted on February 28, 2017.

evaluation with Ms. Null, although he stuttered, making it difficult to understand him, he was reportedly "cheerful" and his social functioning was moderately deficient (Tr. at 93, 524-538, 898-903, 909-957)[13]. In his ability to concentrate, persist or maintain pace, Claimant had only mild limitations because although he alleged limitation in completing tasks, the ALJ noted he also said he could prepare meals, watch television, listen to music, manage funds, and handle his own medical care; during his evaluation with Ms. Null, he was found to be fidgety, but exhibited normal concentration, persistence, and pace (Tr. at 93, 524-538, 898-903). Finally, in his ability to adapt or manage himself, the ALJ again determined Claimant had only mild limitations because he did not allege any symptoms or limitation related to this area, and he stated he was able to handle self-care and personal hygiene, as well as care for his pets, and the objective evidence in the record showed he presented with appropriate grooming and hygiene (Tr. at 93, 524-538). Ultimately, the ALJ determined that Claimant's mental impairments failed to satisfy either "paragraph B" or "paragraph C" criteria. (Tr. at 93-94)

In her assessment for Claimant's RFC, the ALJ again explicitly reviewed the medical evidence in addition to Claimant's allegations concerning his bilateral sciatica, back pain, fluctuating weight, chronic obstructive asthma, speech sound disorder, bipolar disorder schizoaffective disorder and schizoaffective disorder. (Tr. at 95-97) Accordingly, the undersigned **FINDS** that Claimant's argument that his impairments, singly or combined, met Listing requirements lacks merit, the undersigned further **FINDS** that the ALJ's step three determination is supported by the substantial evidence.

---

[13] In addition to again citing Ms. Null's observations, the ALJ referenced Claimant's statements in his Function Report submitted on August 25, 2017 as well as progress notes from Valley Heath Systems dated March 3, 2017 to July 28, 2017.

As an additional matter, and with respect to Claimant's disagreement with the ALJ's characterization of the treatment for his back pain as "fairly conservative" and "with few clinical objective findings of abnormality reported" (Tr. at 97), the undersigned notes Claimant does not explain how this characterization prejudiced his claim. Though Claimant complains that "steroid shots are not conservative treatment" (ECF No. 18 at 16)[14], the ALJ explicitly observed that the treatment for his back pain was "fairly conservative", which it was: the record before the ALJ shows that from March 2014 through November 2018 he received medication, chiropractic treatment, physical therapy, and *two* left epidural steroid injections, in July and August 2018. (Tr. at 95-96, 1042, 1044) For all intents and purposes, the ALJ's description for Claimant's back treatment is "fair." Moreover, given the objective medical evidence before the ALJ, the assessment that there were few clinical findings of abnormality is also "fair." Again, Claimant does not demonstrate how this characterization is prejudicial, especially in light of the ALJ's consideration of Claimant's ongoing complaints of chronic pain and that his pain was not relieved through various treatment modalities. Moreover, while Claimant points out that a more recent August 26, 2019 MRI "revealed disc herniation with impingement of cord surface and chronic severe compression" (ECF No. 18 at 16, citing Tr. at 38-39), this evidence was clearly not before the ALJ,

---

[14] Though not dispositive on this minor issue, the undersigned notes that the case cited by Claimant in his brief, Garrison v. Colvin, 759 F.3d 995 (9th Cir. 2014) did not "h[o]ld that steroid shots are not conservative treatment" as asserted by Claimant. What could be most likely categorized as dicta, the Court did mention in a footnote, "In any event, we doubt that epidural steroid shots to the neck and lower back qualify as "conservative" medical treatment." Id. at 1015, n.20. Regardless, it is of some interest that other courts within this Circuit have been unable to find a bright line rule as to what constitutes "conservative" versus "radical" or "aggressive" treatment. See, e.g., Jones v. Colvin, 2016 WL 1054991 at *5 (D. S.C. March 17, 2016) ("In fact, other courts have found the use of trigger point injections and even epidural steroid injections, alongside pain medication to be conservative treatment. Bays v. Colvin, No. 2:14-CV-01564, 2015 WL 769784, at *18-20 (S.D. W. Va. Feb. 23, 2015) (unpublished); Johnson v. Colvin, No. 3:14-CV-00043, 2015 WL 6738319, at *13 (W.D. Va. Nov. 4, 2015) (unpublished).")

and indeed, occurred *six months after* the ALJ issued her written decision.[15] It is also significant

that the MRI Claimant cites involves his *thoracic* spine, specifically at T5, not the *lumbar* spine.

Of further significance is that a lumbar MRI taken on the same date, August 26, 2019, revealed

only mild degenerative changes (Tr. at 36-37) and appear virtually unchanged from the prior MRIs

the ALJ reviewed in rendering her decision. Accordingly, Claimant's argument that the ALJ erred

in her characterization of his back impairment, and treatment thereof, lacks merit.

With respect to Claimant's other disagreement concerning the ALJ's characterization of

his mental impairments as "stable" (ECF No. 18 at 14; Tr. at 97), once again, Claimant fails to

explain how this description is prejudicial, and only points to Ms. Null's evaluation as a source of

contrary evidence to the ALJ's determination. As noted *supra*, the ALJ reviewed the medical

records concerning Claimant's mental impairments, as well as Claimant's testimony and

statements concerning same, noting both aggravating and mitigating factors. (Tr. at 91, 93, 95, 96-

97) Significantly, the ALJ noted that from Ms. Null's evaluation on May 22, 2017, Claimant was

diagnosed with schizoaffective disorder, bipolar type, and somatic symptom disorder (Tr. at 97,

898-903); since then, the ALJ noted that treatment notes from May, June, and July 2017 "show no

abnormality in mental status (Tr. at 97, 909-957). The ALJ then noted that additional treatment

---

[15] As noted in footnote 3, *supra*, Claimant has not asserted whether this evidence is "new, material . . . and there is a reasonable probability that the additional evidence would change the outcome of the decision" espoused in 20 C.F.R. § 416.1470(a)(5). Generally, when a plaintiff waives any argument not raised on appeal. See, e.g., Pleasant Valley Hosp., Inc. v. Shalala, 32 F.3d 67, 70 (4th Cir. 1994) ("As a general matter, it is inappropriate for courts reviewing appeals of agency decisions to consider arguments not raised before the administrative agency involved."). Regardless, the additional evidence submitted to the Appeals Council does not "relate[] to the period on or before the date of the hearing decision" as required by Section 1470(a)(5), which was noted by the Appeals Council in its decision to deny Claimant's request for review: "You submitted medical records . . . dated March 20, 2019 to August 15, 2019, . . . May 8, 2019, . . . and May 10, 2019 to July 3, 2019 . . . The [ALJ] decided your case through February 21, 2019. This additional evidence does not relate to the period at issue." (See Tr. at 2); see also Adkins v. Barnhart, 2003 WL 21105103, *5 (S.D.W. Va. May 5, 2003) ("Pursuant to the regulations . . . , if additional evidence submitted by a claimant does not relate to the time period on or before the ALJ's decision, the evidence is returned to the claimant, and the claimant is advised about her rights to file a new application.") Indeed, the Appeals Council further advised Claimant he had a right to file a new claim. (Tr. at 2)

records from May through September 2018, Claimant's "mental status was again normal." (Tr. at 97, 1009-1016, 1066-1159, 1219-1312) Therefore, the ALJ determined from this evidence that Claimant's "mental impairments appear stable and well controlled given the normal mental status reported upon evaluation." (Tr. at 97) It is apparent that the ALJ relied heavily on Claimant's treating providers and Claimant's reports concerning his mental impairments to his treating providers, as opposed to a one-time examiner, for her finding these impairments appeared stable and well controlled.[16] This is not error. Accordingly, Claimant's argument that extent lacks merit.

The RFC Assessment and Hypothetical Questions to the Vocational Expert:

Claimant also argues that the ALJ erred by failing to include any mental limitations in the hypothetical posed to the vocational expert, and by limiting him to simple, one to two step instructions. (ECF No. 18 at 14-15) Claimant does not identify what mental limitations were necessary to include in the RFC or explain how the ALJ's hypothetical to the vocational expert was in error.

A claimant's RFC represents the *most* that the individual can do despite his limitations or restrictions. See SSR 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite her

---

[16] Though this evidence was not before the ALJ, it is interesting that in the additional evidence submitted to the Appeals Council, Claimant continued to present with normal or stable psychiatric findings: On April 24, 2019, he was noted to be fully oriented with normal mood and affect (as well as normal gait and station and muscle strength/tone) (Tr. at 14, 56); a June 12, 2019 treatment note indicated Claimant was fully oriented (Tr. at 67); on July 31, 2019, his psychiatric review of systems was "negative" (Tr. at 21, 48) and he was fully oriented with normal mood and affect (Tr. at 24); mental status findings on August 6, 2019 indicated "[a]ll were normal" (Tr. at 29, 43); and an August 15, 2019 report indicated Claimant presented "[a]lert, cooperative, oriented. Mood and affect appropriate" (as well as a "normal gait") (Tr. at 33).

impairments. 20 C.F.R. § 416.945(a). The RFC determination is an issue reserved to the Commissioner. Id. § 416.946(c).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted); see also Felton-Miller v. Astrue, 459 F. App'x 226, 231 (4th Cir. 2011).

To the extent that Claimant is arguing that the RFC assessment is not supported by substantial evidence, as noted *supra*, this Circuit has recognized that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (*per curiam*)). Instead, an ALJ " 'must build an accurate and logical bridge from the evidence to his conclusion.' " Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). In this case, the ALJ provided more than sufficient notations from the record that documented Claimant's complaints concerning his mental impairments, as well as his alleged limitations as a result:

> He has trouble concentrating, estimating he could concentrate for about 15 to 30 minutes at a time. He used to have difficulty getting along with others, but he does not associate[] with anyone except a few friends. He tends to become "extremely irritated."

> He does not go out to eat or to church. He has no hobbies.

> To pass the time, he watches television, but has difficulty following the program. He testified he cannot keep up with what is going on, finally giving up, and goes to sleep.

> He experiences panic attacks two to three times per month, each lasting from 15

> minutes up to a few hours at a time. The attacks were more frequent prior to prescribed medication. He has difficulty being around people, stating too many people cause him to feel dread, despair, anxiety elevates, and he would rather be somewhere else. He has to leave a store recently because too many people are there. He sees his doctor's five to six times per month.

(Tr. at 95) As noted earlier, the ALJ compared this with the objective and other medical evidence of record, ultimately determining that Claimant's mental impairments appeared stable and well controlled. (Tr. at 96-97) In addition to being persuaded by Claimant's normal mental status examinations, the ALJ also gave great weight to the state agency psychological consultants' opinions, which determined Claimant was capable of performing one to two step instructions, unskilled work, and can maintain occasional contact with public and coworkers (Tr. at 97, 286, 302, 320)

In light of Claimant's argument that the ALJ posed an inappropriate hypothetical to the vocational expert, it is noted that this Circuit has long since held that hypothetical questions need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). As stated above, the reconciliation of conflicting evidence was for the ALJ to resolve, not this Court. See SSR 96-8p, 1996 WL 3741784, at *7. Accordingly, the undersigned **FINDS** that the vocational expert's responses to the ALJ's controlling hypothetical question were supported by substantial evidence, and further **FINDS** that the ALJ was entitled to rely upon those responses at the fifth step of the sequential evaluation process. See 20 C.F.R. §§ 416.960(c)(2); 416.966(e).

Although Claimant advocates for an alternate decision, such are matters that involve resolving the conflicting evidence of record, which is an evidentiary finding within the purview of the ALJ. In short, though Claimant may disagree with the ALJ's determination that she can work

at light exertional levels for an eight-hour workday, this Court cannot re-weigh this conflicting evidence or substitute its judgment for the Commissioner's. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also, SSR 96-8p, 1996 WL 3741784, at *7.

In short, the ALJ's narrative of the record included the objective medical evidence, including imaging, and examination findings, as well as the other evidence of record, including Claimant's own statements and testimony; the ALJ's thorough discussion of all this evidence, and her ultimate determination that Claimant remained capable of light unskilled work despite his ongoing complaints, provided sufficient explanation allowing for meaningful judicial review. Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). This Court is not "left to guess about how the ALJ arrived at his conclusions" therefore remand is not necessary. Mascio, 780 F.3d at 637. Accordingly, the undersigned **FINDS** that the ALJ's RFC assessment as well as the controlling hypothetical question to the vocational expert were based upon substantial evidence.

Finally, the undersigned further **FINDS** that the ALJ's analysis of the evidence of record, and the final decision denying Claimant's applications for benefits are also supported by the substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for reversal or remand (ECF No. 18), **GRANT** the Defendant's request to affirm the decision below (ECF No. 21), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4ᵗʰ Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4ᵗʰ Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4ᵗʰ Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: February 23, 2021.



Omar J. Aboulhosn
United States Magistrate Judge